Filed 8/2/23  P. v. Lopez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LUCIANO GALINDO LOPEZ, <br><br> Defendant and Appellant. | F082947 <br><br> (Fresno Super. Ct. No. F08902302) <br><br> **OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Poochigian, Acting P. J., Peña, J. and Snauffer, J.

## INTRODUCTION

In 2009, appellant and defendant Luciano Galindo Lopez (appellant) and codefendant Cortney DeJohn Flemming were convicted after a joint jury trial of count 1, second degree murder of Fidel Jimenez (Pen. Code, § 187, subd. (a))[1] and count 2, attempted murder of Adam Mirelez (§§ 187, subd. (a), 664). The jury further found that as to count 1, codefendant Flemming personally and intentionally discharged a firearm, proximately causing death (§ 12022.53, subd. (d)); and as to count 2, that he personally and intentionally discharged a firearm (*id.*, subd. (c)). As to appellant, the jury found as to both counts that a principal was armed with a firearm (§ 12022, subd. (a)(1)).

Appellant was sentenced to eight years plus 15 years to life. Codefendant Flemming was sentenced to 27 years plus 40 years to life. This court affirmed the judgments in a joint direct appeal.

In 2019, appellant filed a petition for resentencing pursuant to former section 1170.95[2] and alleged he was convicted of murder based on the felony-murder rule and/or the natural and probable consequences doctrine. The trial court appointed counsel, conducted a hearing, and found he was ineligible for resentencing as a matter of law. In doing so, the trial court made factual findings from the reporter's transcript of the trial record and the factual statement from this court's opinion in the direct appeal.

On appeal, appellant contends the trial court improperly made factual findings when it found his petition failed to state a prima facie case for resentencing, and the matter must be remanded for issuance of an order to show cause (OSC) and an evidentiary hearing because the jury was instructed on aiding and abetting and the natural and probable consequences doctrine, and the prosecutor relied on these theories in his

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] Appellant filed his petition in 2019 pursuant to former section 1170.95. As will be discussed below, the statute was substantively amended effective January 1, 2022, and renumbered as section 1172.6 without further change on June 30, 2022. (*People v. Saibu* (2022) 81 Cal.App.5th 709, 715, fn. 3.)

closing argument.  The People concede the trial court improperly made factual findings, and the matter must be remanded for an OSC and an evidentiary hearing.

We agree the trial court improperly made factual findings when it found appellant's petition failed to state a prima facie case and denied the petition without issuing an OSC.  We further find the court's error was prejudicial because the instructions and the prosecutor's closing argument show the jury was instructed that appellant could be convicted based on either direct aiding and abetting with his own intent to kill, or on aiding and abetting and the natural and probable consequences doctrine based on the target offense of assault with a deadly weapon or by means of force likely to result in great bodily injury.  As a result, the matter must be remanded for issuance of an OSC and for the trial court to conduct an evidentiary hearing.

## FACTS[3]

**The Initial Investigation and Fidel Jimenez's Death[4]**

At around 11:45 p.m. on March 23, 2008, which was Easter Sunday, Fresno Police Officers Garcia and Lujan were dispatched to a report of a shooting at the Liquor King at

---

[3] On April 14, 2023, this court granted the People's unopposed motion to take judicial notice of the record and the partially published opinion in the joint direct appeal by appellant and codefendant Flemming.  (*People v. Lopez* (2011) 199 Cal.App.4th 1297.)  The following facts and procedural history are from the record and this court's opinion from the direct appeal.

In reviewing a section 1172.6 petition, the court may rely on "the procedural history of the case recited in any prior appellate opinion."  (§ 1172.6, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 292; *People v. Cooper* (2022) 77 Cal.App.5th 393, 406, fn. 9.)  The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage.  (*People v. Clements,* at p. 292; *People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*).)  We have recited the factual statement from defendant's direct appeal to place his arguments in context and will not rely on that factual statement to resolve his appeal from the trial court's order that found his petition did not state a prima facie case for relief.

[4] The record occasionally gives the name as "Jiminez."  Because the information says "Jimenez," we use that spelling except where quoting.

Herndon and Blackstone. It was a day on which cruising was allowed, so traffic on Blackstone was heavy. The large parking lot, which served Liquor King and several other businesses, contained numerous cars and people. When the officers arrived, cars were leaving the lot and people were running in every direction.

Officer Garcia observed a gray or silver truck that appeared to have collided with a building. The truck's driver, Fidel Jimenez, was slumped over on the truck's seat. He was bleeding from the face or head and had a slight pulse. Someone in the crowd that had gathered advised he had been shot. There was broken glass on the truck's seat and two tall beer cans on the floorboard.

Officer Lujan began crowd control, while Officer Garcia and Sergeant Alvarez, who was now at the scene, tried to extricate Jimenez. Jimenez lost his pulse, but the officers were able to get it back. Emergency personnel then arrived and took over. Alvarez ordered the entire parking lot locked down and put out a preliminary radio broadcast containing information he had received concerning a white Mustang that may have been involved. The car, which contained an African-American male and possibly a Hispanic, had left at a high rate of speed.

There was what appeared to be bullet impact damage to the door frame of a business just south of the one into which the pickup had crashed. There was a bullet entry hole on the passenger side pillar of the pickup, and a deformed bullet fragment was found in the corresponding wall panel. Although a number of latent prints were lifted from vehicles, cans, bottles, and other trash in the parking lot, none could be identified as belonging to Lopez or Flemming. No firearms were found in the pickup nor was an antitheft device called the "Club." However, an open flip-style cell phone was found on the passenger side floorboard of the vehicle.

The entire strip mall/parking lot area was searched for evidence. No Club security devices, bars, or anything else that might be used as a weapon were located. No shell casings were found.

Fidel Jimenez suffered a gunshot wound to the head, behind the right ear, with injuries to the left back of the brain and the cervical spine. He was alive but paralyzed from the neck down when brought to the hospital, and he remained that way until April 1, 2008. On April 1, his neurological status began to change, and it was determined he had developed an aneurysm in the area of several bullet fragments. A corrective procedure was unsuccessful, and Jimenez's family made the decision to withdraw life support. He died on April 4. The cause of death was related to injuries to the brain and spinal cord, with those injuries having been caused by the gunshot wound to the head that he sustained on March 23. The wound course was inconsistent with him looking at the shooter at the time the bullet struck him but was consistent with him looking straight ahead.

## Witness Accounts[5]

### Adam Mirelez

On the evening of March 23, 2008, Adam Mirelez and Jimenez, his longtime friend, went cruising on Blackstone. Jimenez was driving his 1986 primer-gray Silverado pickup. Mirelez was sipping from a can of beer. He never saw Jimenez drinking that night, although there was a second beer can in the truck.

Blackstone was fairly crowded, and at some point, they pulled into the parking lot on the southwest corner of Herndon and Blackstone, where the Liquor King was located. There was a speed bump as they first came in, and a crowd of people and cars. Mirelez estimated they were going five miles per hour or less. Jimenez was on his cell phone.

The car stopped by a median before it reached the crowd of people. Jimenez and Mirelez were trying to get through, but there were people everywhere. As they waited

---

**[5]** In Akira Kurosawa's film *Rashomon*, four individuals witness a crime. Each then recounts the story honestly, but in mutually contradictory ways. Because of the Rashomon-like testimony of the various eyewitnesses – even those who were not acquainted with the victims or defendants – we summarize each individually, rather than attempting to compile a unified account. We also include their statements to police.

for people to move, Mirelez saw appellant on the sidewalk on the driver's side of the truck, almost 10 feet away. Appellant came up to Jimenez's window, which was open, and angrily yelled a couple of times, "What's up, homey?" Jimenez nodded his head at appellant as if to say, "What's up," but he was not really paying attention because he was on the phone.

Appellant then came to Mirelez's side and said the same thing numerous times. Mirelez, who had a can of beer in his hand, put the beer in his lap and pulled the door handle, but the door did not open any distance. Appellant then punched him in the nose through the window, causing Mirelez's nose to bleed profusely. Mirelez leaned down toward Jimenez and grabbed the beer can, which was between his legs. He then raised back up. He never attempted to strike appellant; as far as he knew, there was nothing in the truck he could have used to do so. Jimenez did not have a Club.

Appellant stepped back and yelled at his friend, "Pull the pistol. Pull the pistol." The friend, a tall African-American who was wearing a white sweater and possibly a hood, seemed to come out of nowhere. He pulled a gun from his pocket or belt area and pointed it at Mirelez from a little over six feet away. Mirelez ducked down, heard a shot, and then felt the truck go forward. It hit something, then went over the curb and into a store. He heard two shots altogether. Because he had ducked down, he did not see what happened to appellant or the African-American male after the shooting. Mirelez believed that if he had not ducked down, he possibly would have been shot. The bullet came through the window where he had been sitting. He had been sitting between the gun and Jimenez.

Once the truck hit the building, Mirelez got out and looked at Jimenez. Mirelez did not see any blood, but he could not get Jimenez to wake up. Mirelez then ran. He had just been shot at; there were people everywhere, and he did not know if his assailants were still around or what was going on. He returned within a minute, and the police soon arrived.

6.

When subsequently interviewed by Detective Byrd, Mirelez described the shooter as wearing a fitted baseball cap and a white, zip-up, hooded sweater. Shown a photographic lineup, Mirelez selected appellant's picture and said it looked most like the person who hit him and said to pull out the pistol. Byrd also showed Mirelez a photographic array containing codefendant Flemming's picture, but Mirelez could not identify anyone. Mirelez did not recognize Flemming at trial. When shown a surveillance camera photograph, however, he found the individual's white sweater, and the way he stood and had his hands in his pocket, familiar. Mirelez believed he had previously seen the white sweater on the shooter.

### *Martin Alvarez*

On March 23, 2008, Martin Alvarez was cruising on Blackstone with his friend, Gabriel Lopez, in Gabriel's truck.[6] Seeing a lot of cars in the parking lot at Blackstone and Herndon, they decided to stop. They had parked and gotten out of their vehicle, when Alvarez saw an older gray truck drive in. It was proceeding slowly at five miles per hour or less.

Appellant – whom Alvarez had seen on a prior occasion – was walking across the parking lot, and the truck stopped to let him cross. In Alvarez's opinion, the truck did not stop "in any aggressive way." Appellant, who was about the width of one parking space away and still on the sidewalk, nevertheless threw up his arms, approached the truck, and loudly asked, "What's up dog?" He also said, "Do you have a problem?" and things of that sort. His comments were directed at the driver.

Appellant kept saying the same thing(s) over and over, and the male in the passenger seat of the truck started to open the door. The passenger said something like he was not going to let somebody start arguing over something stupid. By that time, appellant had already gone around the truck and was asking if the passenger was going to

---

[6] To avoid confusion with appellant, we refer to Gabriel Lopez by his first name.

7.

do something.  Appellant then pushed the door closed.  The passenger window was open; Alvarez saw appellant swing at the passenger but could not see whether contact was made.  The passenger reached toward the seat as if to grab something with which to hit appellant back, although Alvarez never saw anything in his hand.  Appellant then called his friend, shouting, "Hey, dog.  Pull that gun out.  Pull that gun out."  Alvarez was not sure where appellant's friend came from, but when appellant shouted, the friend, who was African-American, ran toward the truck.  Alvarez saw him kind of reach and hold his belt area as he moved toward the truck's passenger, shouting, "What's up dog?"

Gabriel told Alvarez to get in the truck, and the two tried to watch what was going on while also going toward their vehicle.  Appellant's friend was arguing and at the same time pointing the gun, which was small and black.  Alvarez saw the truck's driver step on the gas, and appellant's friend shot toward the truck.  Two shots were fired.  The first hit the pillar of the truck.  The second hit the driver.  His foot apparently got stuck on the gas, and the truck hit an SUV and then the building.

Although Alvarez did not see what appellant did after the shots were fired, he saw the shooter jump into the back seat of an older, two-door white car.  The shooter was wearing a white sweatshirt with green lines on it and maybe some jeans.  He was not wearing a hat.  Alvarez did not see where the car went.

Detective Tacadena interviewed Alvarez within hours of the shooting.  Alvarez reported that he saw the Hispanic male and the African-American male getting into a white, older-model car he thought was a Monte Carlo.  Alvarez also related that prior to the shooting, he saw the pickup's passenger reach across his body with his hand and swing at the suspect standing outside the vehicle with an object that appeared red in color.  At some point, the passenger had a beer in his hand.  Alvarez reported hearing the passenger say, "F[**]k this.  I ain't gonna, I ain't gonna take this from this guy[.]"  Alvarez said the African-American was wearing a white sweatshirt with a green shirt underneath.  When shown a photographic lineup containing appellant's picture, Alvarez

identified appellant and said he was 100 percent sure he was the person who punched the passenger and said to pull out the pistol.

### Gabriel Lopez

Gabriel also saw the pickup traveling in the parking lot. He did not believe it was going that fast, because it stopped and waited for him to back into a parking stall. He saw the truck stop at a second point and heard arguments. They seemed to come from the front and side of the truck.

Gabriel saw an African-American male with a white shirt in front of the truck. This man raised his hands. The next thing Gabriel saw was a person with a black shirt reaching into the truck like he was trying to punch the passenger. He heard the person in the white shirt say something like, "Get it out." The person with the black shirt then took a few steps away from the truck and started shooting. The truck, which had accelerated just prior to the shots being fired, turned to the left and hit other cars.

The two individuals involved in the altercation started walking slowly toward where Gabriel's truck was parked. A mid-1980's Monte Carlo SS and a black-and-white Mustang were in that direction. The pair appeared to be walking toward the Monte Carlo, but Gabriel did not see what car they entered.

Detective Byrd interviewed Gabriel a few hours after the shooting. Gabriel said the African-American was possibly wearing a white shirt. Gabriel related that he heard glass break and then shots. He saw the African-American male's hand extend prior to the shooting, but did not see the gun. Gabriel later recontacted Byrd to relate that he had seen the Mustang driving up and down Blackstone, with a passenger who was an African-American male with cornrows and a white shirt.

### Terry Reyes

Terry Reyes was in the Liquor King parking lot a bit after 10:00 p.m. on Easter Sunday, 2008. She saw an older-model, primered truck pull in. It was barely moving because the place was so packed with cars, and then it stopped. Reyes then saw two men

run around the front of the truck to the passenger side. She could hear arguing and saw the Hispanic male start to hit the passenger of the truck through the window. The passenger ducked down or blocked himself from getting hit. Reyes thought she saw a little piece of something, possibly a stick, that he was using to deflect the blows, but he could have been using his arms. She never saw anything come out of the truck and did not believe the people outside the truck were in danger.

Reyes saw the other man, an African-American, pull a gun from the belt area of his jeans and point it at the truck. It looked like he tried to pull the trigger, and nothing happened, but then he pulled again, and Reyes saw two shots and heard gunshots. The gun was shot directly at the truck from the passenger side. The African-American and Hispanic males then ran off and the truck crashed into a building. The suspects ran to what Reyes believed was an older white car that could have been a Mustang.

Reyes told Officer Taliaferro at the scene that the shooter, an African-American male, had stepped out of a Ford Mustang and shot into the victim's vehicle. When interviewed by Tacadena, she said the African-American's hairstyle was a short fade, and he was wearing a white T-shirt and light blue jeans. She also said both suspects left the scene in an older-model white Mustang.

### Jose Vargas

Jose Vargas saw Jimenez's truck pull into the parking lot. He estimated it was travelling five miles per hour or possibly slower, "like a walking pace." Vargas heard an argument between an African-American male and the passenger in the truck, but no reference to a firearm. The African-American male approached the passenger side of the pickup and punched the passenger. The passenger swung backward, moving his hand at an arc up by his ear. There was nothing in his hand. The African-American male then stepped back, pulled a gun from his front pocket or belt, and shot what Vargas believed to be three rounds into the vehicle. The shooter was wearing a white sweatshirt or

10.

sweatshirt jacket and dark jeans or black pants.  He did not have anything on his head. He was the only person Vargas saw who appeared to be associated with this event.

Fresno Police Officer Rose took a statement from Vargas at the scene.  In part, Vargas reported that he saw an African-American male approach the passenger side of the truck, and that at some point he heard a voice yell, "Pull out the piece[.]"

### Juan Padilla

Juan Padilla, who was with Vargas, also saw Jimenez's truck pull into the parking lot.  It was going slow, perhaps five miles per hour.  He subsequently heard some arguing, then saw a punch thrown on the passenger side of the truck.  Because he was not wearing his glasses, he could not see well enough to see who threw the punch.  It appeared that the passenger either swung back or attempted to block a blow, whereupon an African-American individual outside the truck took a step back and made a motion like he was reaching for a weapon.[7]  Padilla turned around and told his friends to duck. He then heard two or three gunshots.  The African-American male ran.

Detective Byrd interviewed Padilla a few days after the shooting.  Padilla said he saw the African-American male go up to the passenger side of the truck and strike the passenger.  He said the African-American male was wearing a white jacket or sweater.

### Yvette Uribe

Yvette Uribe grew up with Flemming and was also acquainted with appellant.  She saw them at Liquor King on Easter Sunday of 2008, although she did not know at what time.  She estimated it was an hour or so before the shooting.

---

[7] Padilla did not see anything in the passenger's hand.  He believed he would have noticed if there was something large, but probably would not have seen anything small.

11.

*Janell Mayberry*

Janell "Nellie" Mayberry was acquainted with both codefendant Flemming and appellant, whom he knew as Chano.[8]  On Easter Sunday, 2008, Mayberry drove his green four-door Infiniti to Flemming's house so they could go cruising.  With Mayberry was Albert "Papa" Hood.  Eventually, Mayberry drove to the Liquor King, accompanied by Hood, Flemming, and Flemming's girlfriend, Claudia.  Mayberry was following a white Monte Carlo that contained Kevin Tatum (an African-American), appellant, and Luis Perez.  On the way, they stopped at several stores.  At no time that evening did Mayberry hear appellant ask if they wanted to take a gun with them.

At some point while Mayberry was in the Liquor King parking lot, he heard, but did not see, a shooting.  He ran back to his car, arriving about the same time as Flemming, Claudia, and Hood.  Everyone was talking about the shooting, although nobody was talking as if they had seen it.  Mayberry immediately left the parking lot.  He did not know who did the shooting or if Flemming had a gun.  He did not see who got into Tatum's car.

At some point after the shooting, appellant called Mayberry, wanting his gun back.  Mayberry and Hood drove to appellant's house about an hour after the shooting.  Appellant grabbed the gun from Mayberry's car, but Mayberry could not remember where in the car.  This was the first time Mayberry saw the gun.

Mayberry and Hood remained at appellant's house for about an hour.  At some point, Flemming called Mayberry.  Flemming may have mentioned cameras at the Liquor King, as they were all wondering whether the store had cameras.

Detectives Byrd and Tacadena interviewed Mayberry two weeks after the investigation started.  They tape-recorded the interview, which took place at Mayberry's

---

[8] Mayberry's testimony might best be described as evolving over the course of his time on the witness stand.  We have attempted to synthesize the versions into one that imparts the most information.

12.

home. By the time of the interview, Byrd had spoken to about 30 people, and so already knew what he should be hearing from Mayberry.[9]

Mayberry initially was very evasive and inconsistent. Ultimately, however, he talked about a person named Chano, and identified a photograph of appellant. He said there was a plan to go cruising on Easter, and that he had gone to appellant's house early that evening to go cruising. Originally, he was in Kevin Tatum's white Monte Carlo SS, but eventually he left in his own green Infiniti. While at appellant's house, appellant asked the group if they wanted him to bring his gun. Flemming told him to bring it. Appellant then brought it out of his house and took it with them when they went cruising.

Mayberry related that they went to the Liquor King parking lot, then left to go to another liquor store and returned. With Mayberry, in the car he was driving, were Albert Hood in the passenger seat, and Flemming and Flemming's girlfriend, Claudia Seamster, in the back seat. Kevin Tatum's white Monte Carlo SS was traveling with them; in that car were Tatum, appellant, and Luis Perez.

Mayberry told Detective Byrd that he heard a shooting, whereupon he ran back to his vehicle. At the vehicle when he arrived were Hood, Flemming, and Seamster. As they were leaving the scene, Flemming and Hood both said, " 'That n[****]r got busted on.' " Flemming also said, "I told him to stop f[**]king around." Seamster was upset and crying, and Flemming was trying to calm her down.

Mayberry related that from the scene, he went south on Blackstone. He dropped Flemming and Seamster off at an apartment complex, then had a conversation with Hood about "laying down" after something like this, meaning they should not be out and about. Appellant subsequently called, requesting his gun, so Mayberry drove to appellant's house. There, Hood retrieved the gun – a .38 Special – from the back seat area where Flemming had been and gave it to appellant. Upon receiving the gun, appellant said

_____

[9] At trial, Mayberry testified that he could not remember what he told Detective Byrd but believed he "[h]alfway" told him the truth.

something to the effect of, "Thanks, fool. I need it," and then took it into the house. Flemming called Mayberry while Mayberry was at appellant's house. Flemming asked if he thought there were videos at the Liquor King. Mayberry then passed the phone to appellant, and Flemming spoke with appellant.

### Luis Perez

Luis Perez had been friends with appellant and codefendant Flemming since childhood. He "[s]omewhat" recalled Easter Sunday of 2008, as he was "kind of drunk" that day. Around 9:00 or 10:00 that night, Perez and Kevin Tatum drove over to appellant's house in Tatum's white Monte Carlo to pick appellant up to go cruising. Perez did not see Flemming there.

The trio drove up and down Blackstone. Perez believed he saw Flemming on Blackstone late that night but did not really remember because he was drunk. Perez's group stopped at the Liquor King parking lot, then went somewhere else to get more liquor, then returned to the Liquor King lot. They probably cruised Blackstone for an hour or two before going to the Liquor King parking lot for the final time.

While Perez was standing outside one of the stores, he heard gunshots. He did not see what happened. He ran to the car; appellant and Tatum were already there. They got into the car and joined a line of vehicles trying to leave. Tatum was driving. It took them three or four minutes to get out of the line, then Tatum dropped Perez and appellant off at appellant's house and left. Perez did not recall any conversation in the car about what had taken place.

Detective Byrd interviewed Perez on April 4, 2008, and tape-recorded their conversation.[10] Perez said he had consumed some hard liquor before going out cruising on Blackstone, and also drank a little once out there. Perez related that on the date of the shooting, he was with Kevin Tatum and appellant. He went to appellant's house but did

---

[10] According to Perez, he had consumed nine or 10 beers prior to the interview.

14.

not see Flemming there.  He thought he might have seen him driving on Blackstone in a green four-door sedan with tinted windows.[11]  Eventually, he admitted seeing Flemming in the Liquor King.

Perez told Detective Byrd that at some point, he heard gunshots at the Liquor King.  When he got to the car, Tatum and appellant were there.  Perez eventually related that appellant said he had almost gotten run over, he was in a fight with the passenger of a truck, and one of his friends shot.  Appellant never said which one.

Perez said that after the shooting, they went to appellant's house, where Perez stayed until he was picked up by somebody else.  The white Monte Carlo left.  Perez first said Tatum did not want to give him a ride home because the tags on the car were not current.  Eventually, he agreed with Detective Byrd that the real reason Tatum did not want to give him a ride home was because they knew the vehicle had been seen at the location of the shooting and that involved parties had gotten into it, and he did not want to be driving it around.

Perez related that a green car showed up at appellant's house.  It looked like the same car Flemming had been in.  The car was present at the Liquor King.  When it arrived at appellant's house, its occupants gave appellant a gun.

Perez said he himself was wearing a red hat and red shirt that night.  Appellant was wearing a black jacket, and Flemming was wearing a white sweater with a black shirt underneath.  Perez said Tatum might have been wearing a white jersey, then later mentioned a team jersey.[12]

### Kevin Tatum

Kevin Tatum had known Flemming since high school.  He first met appellant on Easter night, 2008, when he went cruising with appellant and Luis Perez, each of whom

[11] The windows of Mayberry's car were tinted.
[12] The final descriptions Perez gave Detective Byrd were consistent with what Byrd saw on a surveillance videotape taken inside the Liquor King.

he picked up in his white 1987 Monte Carlo SS.  While picking appellant up at appellant's house, there was no mention of a handgun.  Tatum did not remember if he saw Flemming at appellant's house.  At some point, he saw a green car owned by Janell Mayberry, but he did not remember when.

The trio went cruising down Blackstone somewhere in the timeframe of 8:00 or 9:00 p.m.  They ended up in the Liquor King parking lot, then left to go to another liquor store down the block.  At some point, they returned to the Liquor King parking lot.  When the shooting occurred, Tatum was in a different area of the parking lot.  Mayberry's car was next to his.

Tatum did not see the shooting but heard the shots.  People then scattered.  Tatum ran to his car.  When he left the parking lot, Perez and appellant were with him.  The green car left at the same time.  It contained Mayberry, Hood, Flemming, and Claudia.  Tatum did not remember anybody in his car being excited or what appellant might have been saying.

Tatum dropped appellant off at home.  He believed he also dropped Perez off, then went home himself.  He made no comment, and was not concerned, about anybody possibly looking for his car, which he accidentally wrecked soon after the shooting.

On April 15, Detective Byrd interviewed Tatum, who admitted being in the Liquor King on Easter.  Byrd showed Tatum some digital photographs that were created from the video surveillance system inside the store.  Tatum identified himself on one of the photographs.  He recognized himself by his clothing, mainly his blue hat.  Tatum was able to say who else was in the photograph, and that those people were in the store at the time he was.  Tatum identified Flemming in one of the photographs and mentioned he was wearing a white jacket.  He was also able to identify Perez, who was wearing a red hat and red shirt, and appellant.

16.

*Claudia Seamster*[13]

On Easter Sunday, 2008, Flemming was at Claudia Seamster's house for most of the day. At some point around nightfall, Mayberry picked up the couple. Hood was in the car with him. They went riding around. Seamster believed they went to a liquor store, although Flemming was not drinking at all that day. No other car was with them. Seamster was unacquainted with appellant, except for seeing him in court. Although she saw a lot of people on Easter Sunday night, she did not see him or go to his house. She did not see a handgun or see him provide a handgun to Flemming.

At some point, there was a shooting at their location. Seamster had gotten out of the car to go to the restroom when she heard loud noises, then everybody panicked. There were people and cars everywhere, and at first, she could not find Mayberry's vehicle. When she finally located it, it was not in the same place it had been. Mayberry, Flemming, and Hood were already inside. One of them said they heard gunshots. They were scared. No one said who had done the shooting, and she did not see a gun.

Detective Byrd obtained information that Seamster might be an important person in the case three or four days after the shooting. He made numerous unsuccessful attempts to contact her over the course of three or four months. In October 2008, he saw her in the audience at one of the hearings in this case and asked her to accompany him to the police department so he could obtain a statement. She agreed to do so. She was not under arrest, and he interviewed her in his office rather than in an interview room.[14]

In the interview, Seamster related that she had never met appellant before the night of the shooting. He was a friend of Flemming, Mayberry, and Hood. They were driving around, went somewhere, and appellant was there.

---

[13] Seamster and Flemming married in January 2009. Although she used Flemming as her last name at the time of trial, we refer to her as Seamster for clarity.

[14] A recording of the interview was played for the jury.

Seamster admitted seeing the gun at one of the stops she, Mayberry, Flemming, and Hood had made. Appellant had it. She did not see it in Flemming's possession or in the car. She eventually admitted the people with her in the car were saying that they were arguing or something and the guy in the truck reached for something. When Detective Byrd asked whether Flemming told Seamster that he shot the victim, Seamster responded that he said it was because they were arguing and he reached for something and Flemming got scared, she guessed. It was being said that he thought the guy was going to get a weapon or something. Seamster believed Flemming was the one saying this, but she did not know. Seamster did not know if Flemming shot the victim. If he did, it would be out of character for him and would be because somebody provoked him, or he felt he was in danger.

**Additional Evidence**

On April 3, 2008, appellant was taken into custody and a search warrant was executed at his residence. A Rossi .38 Special revolver containing two expended cartridges and no live rounds was found on the floor of his bedroom closet, wrapped in a black T-shirt.[15] A black knit cap containing live ammunition was found on a dresser in the same room. The gun and expended cartridges were subsequently processed for fingerprints. None were located. The gun's grip and trigger were swabbed for DNA, and DNA samples were obtained from defendant and codefendant Flemming. Although a DNA profile consistent with a single individual was obtained from the trigger, Flemming was eliminated as the source. A mixture of DNA from at least three individuals, one of whom was female, was obtained from the grip; again, Flemming was eliminated as a

---

[15] Because the gun was a revolver, it did not eject shell casings when fired. Shown this gun at trial, Alvarez testified it was consistent with the one used to shoot Jimenez, although he could not say it was the same gun. Shown a photograph of this gun by Detective Byrd, Mayberry said it looked like the one he had seen on the night of the shooting.

18.

source.[16]  Appellant, however, could not be excluded as a contributor to the DNA obtained from either location.  The DNA profile obtained from the trigger was indistinguishable from the profile obtained from appellant's reference sample, making it very likely appellant was the source of that DNA.  It could not be determined how long the DNA had been there.  It could not be determined if the bullet fragment found in Jimenez's truck was fired by this gun, but neither could the gun be eliminated.

On April 4, 2008, Detective Byrd interviewed Flemming, who was in custody.  Flemming related that he was at his mother's house all day on Easter, and that he did not leave until about midnight.  When he left, he was with his friend Nellie, whose last name he did not know.  They were in Nellie's vehicle, a light blue Ford Explorer, and they went driving around on the west side.  Flemming first denied knowing the Liquor King's location, but later said he had probably gone there, but was not sure because he had been drinking and passed out at one point.  Flemming denied being at the Liquor King parking lot at approximately 11:45 p.m. on Easter or shooting anyone that night.  He admitted knowing appellant but denied seeing him that day and said he had not seen him in about four months.

Detectives Byrd and Tacadena showed a photographic lineup containing Flemming's picture to several witnesses who did not make an identification, including Justina and Crystal Torres and Martin Alvarez.

---

[16] According to Scott D. Lewis, senior criminalist for the State of California, if someone used a handgun and then wiped it down to remove fingerprints, the handgun was left in a car and then picked up by a second individual and handed to a third individual, and the handgun was then stored in a cloth covered in bodily excretions, the chances of detecting the original handler of the gun would be almost zero.  If the gun were wrapped in something that had semen and vaginal fluid on it, this could account for finding a profile with at least three contributors including a female.

19.

**Appellant's Defense Evidence**

Crystal Torres was not a friend of either appellant or codefendant Flemming. On March 23, 2008, she was not drinking. She heard an argument and saw an African-American male in a white T-shirt, arguing with a person in the victim's truck. The man in the white shirt was in front of the truck. He came around from the driver's side to the passenger side. Another male, a Hispanic who was wearing a sweater, seemed to be with him and came from the same spot as the African-American. The African-American male swung at the passenger in the truck, but Torres did not know if the blow connected. The passenger flinched back, and the driver yelled something. The passenger reached down and pulled out a red Club, which he swung halfway out the window. The African-American male moved back, and the passenger put the Club back in the truck. Someone yelled, "Pull it out." The African-American male stepped back and pulled out a gun. He fired, and the driver pulled the passenger down. The truck reversed and tried to get out, but there were too many cars, and the African-American male fired again. The truck then went forward and hit another truck and then struck a building.

**Codefendant Flemming's Defense Evidence**

Christopher DeLecce was cruising on the night of Easter Sunday, 2008. At about 10:00 p.m., he arrived in the area of Blackstone and Bullard to Herndon. Because his car was overheating, DeLecce pulled over by the Mexican restaurant in the same parking lot as the liquor store. There was a party atmosphere in the area, with numerous cars and people.

At some point, DeLecce heard a couple pops. He first thought it was firecrackers, but then saw a 1972 to 1974 white Chevrolet pickup "peeling out." It hit two parked cars and went into a building. DeLecce saw a person standing next to where the pickup would have been right before it peeled out. He had his arm extended and was shooting at the back of the pickup. The person, an African-American male, had cornrows, a white T-

shirt, and blue jeans. DeLecce could not tell if he was with anyone. The gun was small and chrome, and DeLecce believed about five shots were fired.

Nestor Cerna was cruising on Easter Sunday, 2008, and was in the parking lot at about 10:30 or 10:45 p.m., when he heard gunshots. Before the shots were fired, Cerna's attention was drawn to a 1969 or 1970 white Oldsmobile 442. An African-American male was associated with that car. He was wearing a white shirt and had beaded cornrows.[17] Cerna had seen him earlier in the evening when cruising on Kings Canyon; the person's partner, who was also African-American, was right behind him in a car that was the same year and body style. When the shooting happened, the vehicle was in the area of the shots, but no one was inside. The African-American male was around the crowd that was near the shooting. Seconds before the shooting, Cerna saw a white, lowered, older Chevrolet pickup that later crashed into a building, doing a burnout in the parking lot.[18] As this truck was pulling away, Cerna saw the smoke from its tires. He then heard shots and the truck crashed. The passenger jumped out and ran down the sidewalk by the Liquor King. He was not carrying anything and was waving his arms.

**PROCEDURAL BACKGROUND**

**The Charges**

On November 7, 2008, an information was filed in the Superior Court of Fresno County charging appellant and codefendant Flemming with count 1, murder (§ 187, subd. (a)); and count 2, attempted murder (§§ 664, 187, subd. (a)).

As to counts 1 and 2, it was alleged codefendant Flemming personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53,

---

[17] When interviewed by detectives, Cerna said this individual was possibly wearing a yellow shirt.

[18] Crystal Torres observed a white pickup smoking its tires. She was acquainted with the passenger. This was not the same truck as the victim's truck. It was the only vehicle she saw smoking its tires in the 25 to 30 minutes she was in the parking lot.

subds. (d), (c); and as to appellant, that a principal was armed with a firearm in the commission and attempted commission of the offenses (§ 12022, subd. (a)(1)).

**Jury Instructions**

The court instructed the jury with CALCRIM No. 400 on principals and aiders and abettors – that a person could be guilty of a crime as the perpetrator who directly commits the crime, or he may have aided and abetted the perpetrator, and a person was "equally guilty" of the crime whether he committed it personally or aided and abetted the perpetrator who committed it.

> "Under some specific circumstances if the evidence establishes aiding and abetting of one crime a person may also be found guilty of other crimes that occurred during the commission of the first crime. In this case the prosecution has offered three theories to hold [appellant] responsible for the crimes in counts 1 and 2 …. [¶] [¶] The three theories of liability are these: One, a defendant who engages in conduct that is an element of the charged crime is a perpetrator of the completed crime, not an aider and abettor. Two, a defendant who is simply … an aider and abetter [sic] to the charged crime itself. And three, a defendant is an aider and abetter [sic] to an uncharged crime and the charged crime is a natural and probable consequence of that uncharged crime." (*People v. Lopez*, *supra*, F059255.)

The jury was instructed that to convict appellant as a direct aider and abettor, the prosecution had to prove appellant knew the perpetrator intended to commit the crime, appellant intended to aid and abet the perpetrator in committing the crime, and appellant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

The court further instructed with CALCRIM No. 403 as to appellant's guilt of the charged offenses as an aider and abettor under the natural and probable consequences doctrine – that before the jury decided whether appellant was guilty of the charged offenses under the natural and probable consequences doctrine of aiding and abetting an uncharged crime, it had to decide whether appellant was guilty of assault by a firearm or assault by means likely to produce great bodily injury. (*People v. Lopez*, *supra*,

22.

F059255.)  CALCRIM No. 403 stated that to convict appellant of counts 1 and/or 2 under this theory, the jury had to find appellant was guilty of assault by a firearm or assault by means likely to produce great bodily injury; during the commission of the assault offense, a coparticipant in the assault offense committed count 1, murder, or count 2, attempted murder; and a reasonable person in appellant's position would have known the commission of murder or attempted murder was a natural and probable consequence of the commission of the assault offense.  "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes," and a natural and probable consequence is a foreseeable consequence.

The court also defined the offenses of assault with a firearm or assault with force likely to produce great bodily injury.

After it read the instructions on the assault offenses, the court advised the jury that "[t]hose are the theories of liability based on aiding and abetting," and it was going to turn to the instructions on homicide.  (*People v. Lopez, supra,* F059255.)  The court instructed on first and second degree murder, express and implied malice, attempted murder, voluntary manslaughter, and attempted voluntary manslaughter.

As to the firearm enhancements, the jury was instructed with CALCRIM No. 3115, that if it convicted appellant of counts 1 and 2, it had to determine whether the People proved the allegation that "one of the principals was armed with a firearm in the commission or attempted commission of that crime," and that a person was a principal if he directly commits or attempts to commit a crime, or if he aids and abets someone else to attempt to commit the crime.

**The Prosecutor's Closing Argument**

The prosecutor began his closing argument by stating that codefendant Flemming "pull[ed] the trigger.  He committed the crime."  (*People v. Lopez, supra,* F059255.)

As for appellant, he could be "viewed as either an aider and abetter [*sic*] or … directly as a principal.  Either way works."  (*People v. Lopez, supra,* F059255.)

23.

Appellant's guilt was based on "two separate ideas because there's a set of crimes that he personally committed and then there's also a crime that he aided and abetted." (*Ibid.*) "[A]s to [appellant] there's two different routes. It doesn't make one wrong it makes them equally valid." (*Ibid.*)

The prosecutor argued appellant was "a principal" because he started the fight, called for the gun, and provided the gun in the first place. As a result, appellant would be guilty as a direct aider and abettor because he had "knowledge of the unlawful purpose of the perpetrator," he had the intent or purpose of encouraging or facilitating the commission of the crime, and he aided, promoted, encouraged, or instigated the crime by his acts and advice. (*People v. Lopez, supra*, F059255.)

The prosecutor asserted appellant could also be liable for murder as an aider and abettor of the assault because murder was a natural and probable consequence of an assault with a firearm. Appellant provided Flemming with the firearm, and that was "aiding and abetting an assault with a firearm." Appellant assaulted the passenger in the car, and he aided and abetted the murder "where death is certainly a foreseeable consequence when you call somebody to bring out a loaded firearm." (*People v. Lopez, supra*, F059255.)

> "An aider and abetter [*sic*] is guilty of the consequences of their crimes. So what are we talking about there? One who aids and abets another of that crime, he's not only guilty of the crime he aids and abets, in our case, an assault with a firearm, but he is also guilty of any other crime committed by a principal, which is the natural and probable consequences of the crime originally aided and abetted. [¶] So what does that mean? It means that when you pull a gun out or you call for a gun to be pointed at somebody there is a darn good chance somebody's going to get shot. And if somebody gets shot there's a darn good chance somebody is going to die." (*People v. Lopez, supra*, F059255.)

The prosecutor asserted that in this case, appellant started the attack "with brass knuckles, sucker punching the guy in the car and then we've got him calling for backup, for the gun to come out. He's equally responsible fight down the line. [¶] But the law

24.

says there's also the aider and abetter [*sic*] theory. It's just another way to reach the same destination," and appellant would be held responsible for his actions. (*People v. Lopez*, *supra*, F059255.)

In rebuttal argument, the prosecutor again reviewed the legal standard for natural and probable consequences. "Calling for a gun to come out in the middle of a fight is an assault with a firearm" and a crime, and it was "foreseeable that someone could die" as the natural and probable consequences of that assault. (*People v. Lopez*, *supra*, F059255.)

**Convictions and Sentence**

On September 8, 2009, the jury convicted appellant and codefendant Flemming of counts 1 and 2, second degree murder and attempted murder, and found true the enhancements attached to the counts.

On December 11, 2009, appellant was sentenced to an aggregate term of eight years plus 15 years to life as follows: as to count 1, murder, 15 years to life plus one year for the firearm enhancement; and as to count 2, a consecutive midterm of seven years, and dismissed the term for the attached enhancement.

**Direct Appeal**

On October 14, 2011, this court filed a partially published opinion in the joint direct appeal by appellant and codefendant Flemming that ordered the abstract of judgment corrected and otherwise affirmed the judgments. (*People v. Lopez*, *supra*, 199 Cal.App.4th at pp. 1307–1308.)

In the published portion of the opinion, we rejected their arguments that the standard CALCRIM instructions did not correctly set out the imminence requirement for imperfect self-defense and that the error was exacerbated by the special instruction given at the prosecutor's request. (*People v. Lopez, supra*, 199 Cal.App.4th at pp. 1301–1307.) In the nonpublished portion, we rejected their claims that the court committed prejudicial error by admitting a surveillance video from the Liquor King, and still photographs made

25.

from that video, because they were not adequately authenticated; the court should have dismissed a juror for alleged misconduct; use of the "kill zone" phrase in the instructions; challenges to the heat of passion instructions; prosecutorial misconduct; and imposition of certain fees. (*People v. Lopez*, *supra*, F059255.)

## PETITION FOR RESENTENCING

On January 2, 2019, appellant filed a petition, in pro. per., for resentencing of his murder conviction and requested appointment of counsel pursuant to former section 1170.95.

Appellant's supporting declaration consisted of a preprinted form where he checked boxes that stated (1) a complaint, information, or indictment was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) at trial, he was convicted of first or second degree murder under the felony-murder rule or the natural and probable consequences doctrine; (3) he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019; and (4) there was a prior determination by a court or jury that he was not a major participant and/or did not act with reckless indifference to human life.

The court appointed counsel to represent appellant.

**The People's Opposition**

On March 1, 2019, January 14 and September 30, 2020, the prosecutor filed oppositional authorities and argued appellant failed to state a prima facie case, and he was not eligible for resentencing because he aided and abetted the murder with the intent to kill. In making this argument, the prosecution relied on the factual statement in this court's opinion in appellant's direct appeal.[19]

---

[19] The prosecution filed a separate motion to dismiss the petition based on the claim that former section 1170.95 was unconstitutional; it was denied.

**Appellant's Reply**

On May 21, 2021, appellant's counsel filed a reply to the opposition, and argued the trial record showed appellant was convicted under the natural and probable consequences doctrine based on the instructions and the prosecutor's closing argument. In support of this argument, counsel attached the reporter's transcript of the entirety of the jury instructions.

**The Court's Hearing**

On June 4, 2021, the court conducted a hearing on appellant's petition. Appellant was present with his attorney.

Appellant's counsel argued the instructions permitted the jury to convict appellant based on either being an aider and abettor with the intent to kill, or as an aider and abettor under the natural and probable consequences doctrine. Counsel argued the court could only consider the jury instructions and verdict forms as the record of conviction to make the prima facie finding, and it could not make factual findings. Appellant was not the actual killer, the prima facie issue raised a factual question that could not be resolved based on the opinion from appellant's direct appeal, and the court should issue an OSC and order an evidentiary hearing.

The prosecutor replied that the "basic facts" in the case were uncontested, appellant acted as a major participant with reckless indifference to human life, and the court could make factual findings from the trial transcript.

The court acknowledged the law as to the prima facie finding was in a state of flux.[20] The court stated that to make the prima facie determination, it had reviewed the

---

[20] At the time of the hearing on appellant's petition, *Lewis* was pending before the California Supreme Court. On July 26, 2021, a few weeks later, the opinion was filed in *Lewis* and clarified that while appellate opinions are considered part of the record of conviction, "the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all the answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court

reporter's transcript from appellant's jury trial and the instructions. The court further stated there was no dispute whether appellant was the shooter, and he was prosecuted and tried "under aiding and abetting theory as well as natural and probable consequences."

### *The Court's Denial of the Petition*

The court extensively reviewed the testimony from the reporter's transcript of appellant's jury trial and the facts stated in this court's opinion in appellant's direct appeal and denied the petition without issuing an OSC.

> "Review of the transcript of the record of conviction shows that to this Court's way of thinking that there was compelling evidence that [appellant] directly aided and abetted the murder of Fidel Jimenez notwithstanding the theory of liability that may now be deemed to be unlawful pursuant to SB 1437. So … to this Court's way of thinking, the evidence was sufficient and clearly so and plainly so for the jury to infer that [appellant] engaged in conduct that showed a mens rea intent, malice in this case, and accordingly his petition would be denied."

On June 18, 2021, appellant filed a timely notice of appeal.

## DISCUSSION

On appeal, appellant argues the matter must be remanded for issuance of an OSC and an evidentiary hearing because the trial court improperly made factual findings when it found appellant's petition failed to state a prima facie case for resentencing. Appellant argues the record of conviction does not establish that he was convicted as a direct aider and abettor with the intent to kill, because the jury instructions and the prosecutor's closing argument show the jury was advised it could convict appellant as an aider and abettor who committed an assault under the natural and probable consequences doctrine.

In response, the People agree the trial court improperly made factual findings when it denied appellant's petition, because the jury was instructed on both direct aiding and abetting with the intent to kill and aiding and abetting based on the natural and

---

should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra*, 11 Cal.5th at p. 972.)

probable consequences doctrine and the commission of an assault. The People agree the record of conviction did not show, as a matter of law, that appellant was not convicted based on an imputed malice theory, and an evidentiary hearing should be held.

## I.      Section 1172.6

As relevant to the instant appeal, effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*People v. Harden* (2022) 81 Cal.App.5th 45, 51; *People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*).)

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended," initially codified in former section 1170.95. (*Strong, supra*, 13 Cal.5th at p. 708, fn. omitted; *Lewis, supra*, 11 Cal.5th at p. 959.) The initial version of former section 1170.95 permitted "a person with an existing conviction for felony murder or murder under the natural and probable consequences doctrine to petition the sentencing court to have the murder conviction vacated and to be resentenced on any remaining counts if he or she could not have been convicted of murder as a result of the other legislative changes implemented by Senate Bill ... 1437." (*People v. Flores* (2020) 44 Cal.App.5th 985, 992.) Effective January 1, 2022, Senate Bill No. 775 (2020–2021 Reg. Sess.) made substantive amendments to former section 1170.95 that were consistent with *People v. Lewis, supra*, 11 Cal.5th 952, and also " '[c]larifie[d] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories.' " (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. 18; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388.) On June 30, 2022, the

29.

statute was renumbered as section 1172.6 without further substantive changes. (*People v. Saibu*, *supra,* 81 Cal.App.5th at p. 715, fn. 3.)

Also, as relevant to the instant appeal, section 1172.6 states that "[a]fter the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so." (§ 1172.6, subd. (c).)

The prima facie inquiry under section 1172.6, subdivision (c) is "limited." (*Lewis, supra*, 11 Cal.5th at p. 971.) In determining whether a petitioner made a prima facie case for relief, the court may review the record of conviction that allows the court "to distinguish petitions with potential merit from those that are clearly meritless. This is consistent with the statute's overall purpose: to ensure that … culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of a single-step prima facie review process." (*Lewis, supra,* 11 Cal.5th at p. 971 & fn. 6.) " '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971.)

If an OSC is issued, "the court shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.…" (§ 1172.6, subd. (d)(1).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens...." (§ 1172.6, subd. (d)(3).) "If such evidence may not be considered at an evidentiary hearing to determine a petitioner's ultimate eligibility for resentencing, we fail to see how such evidence could establish, as a matter of law, a petitioner's ineligibility for resentencing" in determining whether he made a prima facie case for relief. (*People v. Flores* (2022) 76 Cal.App.5th 974, 988, fn. omitted.)

## II. The Court's Order Denying the Petition

We first note that the court complied with section 1172.6 by appointing counsel, ordering further briefing, conducting a hearing on the petition, and giving reasons for finding appellant's petition did not state a prima facie case.

In denying appellant's petition, however, the court expressly made factual findings that appellant was convicted as a direct aider and abettor who acted with the intent to kill, based on its review of the transcript from his jury trial and the factual summary from this court's opinion that affirmed his convictions in his direct appeal. As explained above, the role of the appellate opinion is limited in making the prima facie determination, and the court may not rely on factual summaries contained in prior appellate decisions or engage

31.

in fact finding involving the weighing of evidence or the exercise of discretion, in denying the petition without issuing an OSC. (*People v. Clements, supra,* 75 Cal.App.5th at p. 292; *Lewis, supra,* 11 Cal.5th at pp. 971, 972.)

We agree with the parties that the trial court erroneously made factual findings when it found appellant's petition failed to state a prima facie case, that appellant was a direct aider and abettor who acted with the intent to kill and denied appellant's petition without issuing an OSC.

To demonstrate prejudice from the court's erroneous denial of a section 1172.6 petition by making factual findings before the issuance of an OSC, the petitioner must show it is reasonably probable that, absent the error, his petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

In making this determination, we may review the record of conviction, which includes the jury instructions (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251–1252; *People v. Offley* (2020) 48 Cal.App.5th 588, 599; *People v. Harden*, *supra*, 81 Cal.App.5th at pp. 50, 54–55), the closing arguments, and the verdicts. (*People v. Lopez* (2022) 78 Cal.App.5th 1, 13; *People v. Ervin* (2021) 72 Cal.App.5th 90, 106; *People v. Jenkins* (2021) 70 Cal.App.5th 924, 935.)

## III. Direct and Indirect Aiding and Abetting

The jury herein was instructed that it could convict appellant of counts 1 and 2 either as a direct aider and abettor who acted with the intent to kill, or under the natural and probable consequences doctrine based on his commission of an assaultive offense. In closing argument, the prosecutor stated the evidence showed codefendant Flemming was the actual perpetrator and, consistent with the instructions, that appellant was being tried under the two possible aiding and abetting theories.

"Generally, a defendant may be convicted of a crime either as a perpetrator or as an aider and abettor. [Citation.] An aider and abettor can be held liable for crimes that

32.

were intentionally aided and abetted (target offenses); an aider and abettor can also be held liable for any crimes that were not intended, but were reasonably foreseeable (nontarget offenses). [Citation.] Liability for intentional, target offenses is known as 'direct' aider and abettor liability; liability for unintentional, nontarget offenses is known as the ' " 'natural and probable consequences' doctrine." ' " (*In re Loza* (2018) 27 Cal.App.5th 797, 801, fn. omitted; *People v. Williams* (2015) 61 Cal.4th 1244, 1268.)

Under the direct theory, the prosecution "must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 279.) "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*People v.Gentile* (2020) 10 Cal.5th 830, 848.)

Under the indirect theory, where the offense that "the perpetrator actually commits is different from the originally intended crime, the natural and probable consequences doctrine limits liability to those offenses that are reasonably foreseeable consequences of the act originally aided and abetted." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 108.) Under the natural and probable consequences theory as it previously applied to aiding and abetting murder, "a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 683.)

*Analysis*

Based on the record of conviction, including the jury instructions, closing arguments, and verdicts, we cannot find that the trial court's erroneous denial of appellant's petition by making factual findings was not prejudicial. If the jury had only been instructed on the theory of direct aiding and abetting with the intent to kill, then the

record of conviction would have established appellant was convicted of murder based on his own intent to kill.

In this case, however, the jury was instructed with CALCRIM No. 403, that it could also convict appellant of the charged offenses based on the natural and probable consequences theory, if it found appellant was guilty of one of the assaultive offenses; that during the commission of the assault offense, a coparticipant committed the murder or attempted murder; and a reasonable person in appellant's position would have known the commission of murder or attempted murder was a natural and probable consequence of the commission of the assault offense. Indeed, the prosecutor acknowledged in closing argument that codefendant Flemming was the actual shooter but argued appellant could be guilty of murder either as a direct aider and abettor, or as an aider and abettor of the assault offense because murder was a natural and probable consequence of the assault with a firearm. "An aider and abetter [*sic*] is guilty of the consequences of their crimes. So what are we talking about there? One who aids and abets another of that crime, he's not only guilty of the crime he aids and abets, in our case, an assault with a firearm, but he is also guilty of any other crime committed by a principal, which is the natural and probable consequences of the crime originally aided and abetted. [¶] So what does that mean? It means that when you pull a gun out or you call for a gun to be pointed at somebody there is a darn good chance somebody's going to get shot. And if somebody gets shot there's a darn good chance somebody is going to die." (*People v. Lopez*, *supra*, F059255.)

We thus conclude the matter must be remanded to the trial court for issuance of an OSC and an evidentiary hearing pursuant to section 1172.6.

## DISPOSITION

The court's order of June 4, 2021, denying appellant's petition for resentencing without issuing an order to show cause, is reversed, and the matter remanded for an evidentiary hearing pursuant to section 1172.6.

34.